IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ISAAC GUEST, individually and as parent and )
natural guardian of his minor children I.G., M.G., )
S.G. and J.G., and NICOLE GUEST, individually )
and as parent and natural guardian of her minor )
children I.G., M.G., S.G. and J.G., )
     Plaintiffs, )
      )
vs ) Civil Action No. 20-130
      )
      ) Magistrate Judge Dodge
ALLEGHENY COUNTY and DESARAE )
HORTON, )
      )
     Defendants. )

## MEMORANDUM OPINION

  Plaintiffs Isaac and Nicole Guest bring this civil rights action pursuant to 42 U.S.C. § 1983, both in their individual capacities and as parents and natural guardians of their minor children I.G., M.G., S.G. and J.G.  Plaintiffs allege that their due process rights were violated when the children were improperly removed from their custody on May 15, 2019 based upon an improperly obtained Emergency Custody Authorization ("ECA"). Named as Defendants are Allegheny County and Desarae Horton ("Ms. Horton"), a caseworker for Allegheny County Office of Children Youth and Families ("OCYF").

  Currently pending before the Court is Defendants' motion to dismiss (ECF No. 8). For the reasons that follow, their motion will be granted in part and denied in part.

### I. Relevant Procedural History

  Plaintiffs commenced this action, in which jurisdiction is based upon their civil rights claims, in January 2020. Plaintiffs allege in Count I that Defendants violated their substantive due process right to familial integrity. In Count II, they contend that Defendants violated their

procedural due process rights by obtaining an ECA under false pretenses.

On April 28, 2020, Defendants filed a motion to dismiss (ECF No. 8) which has been fully briefed (ECF Nos. 9, 14, 15, 17).

## II.   **Background Facts**

The Complaint alleges that on April 29, 2019, Ms. Horton filed four petitions alleging that Plaintiffs' minor children were dependent as defined by the Juvenile Act.[1] She alleged in these petitions that on March 2, 2019, OCYF received a referral alleging domestic violence in which Mr. Guest sustained a bloody nose after an argument concerning a cell phone charger. The petitions claimed that J.G. was in her mother's arms during this argument but was not harmed in any way. (Compl. ¶ 9; ECF No. 8 Ex. 1.) Mr. and Mrs. Guest were interviewed during an unannounced home visit on March 2, 2019 and denied both that any domestic violence occurred or that J.G. was in her mother's arms during their argument. Mr. Guest agreed to cooperate if a caseworker was assigned to complete further investigation. (*Id.* ¶ 10.)

Ms. Horton stated in the petitions that although a letter was sent to the home scheduling a home visit for March 19, 2019, the Guests were not home that on that date. (Compl. ¶ 11.) On April 2, 2019, Ms. Horton arrived for an unannounced visit, but Mr. Guest would not allow her in the residence until he spoke to the director of the agency. Ms. Horton alleged that she told Mr. Guest that a petition would be filed because of concerns of domestic violence and OCYF being unable to assess the children's safety. (*Id.* ¶12.)

According to the information in the petitions, Mr. Guest later spoke to the director of the agency and agreed to a home visit, which took place on April 9, 2019. (Compl. ¶ 13.) The

---

[1] Title 42 Pa. C.S., Ch. 63. A dependent child is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa. C.S. § 6302.

petitions do not allege that there was any harm to the children. (*Id.*) The petitions also referred to prior incidents, none of which involved harm to the children. (*Id.* ¶14.)

Plaintiffs allege that in an effort to "beef up" these petitions since they did not include any information that about any abuse or neglect of the children, Ms. Horton contacted the Westmoreland County Children's Bureau concerning incidents that allegedly occurred in 2014. She alleged that she learned that Mr. Guest admitted violating his probation during a domestic violence-related incident and that he was under a court order to complete anger management and drug and alcohol counseling. (Compl. ¶ 15.) Plaintiffs allege, however, that they have been advised by the Westmoreland County Children's Bureau that no such information was provided to Ms. Horton and that this allegation is false. (*Id.* ¶ 16.)[2]

The alleged basis for the petitions was that the children were subject to abuse and/or neglect because they were without proper care or control.  (Compl. ¶ 17.) On May 15, 2019, a hearing was held on the petitions in the Juvenile Division of the Court of Common Pleas of Allegheny County.  Judge McCrady issued an order that, among other things, stated that: "Parents have screens today[;] if positive referred [sic] for [drug and alcohol] evaluation. If any new allegations of [Intimate Partner Violence] or physical abuse allegations are received by OCYF – OCYF to obtain an ECA." The order did not state that the children should be placed in foster care if the parents did not complete the drug and alcohol scans or even if the scans came back positive. (*Id.* ¶¶ 17-18; ECF No. 8 Ex. 4.)

---

[2] In their brief, Defendants note that the Complaint is "silent as to whether the substantive allegations are true or false, that is whether Mr. Guest was on probation." (ECF No. 9 at 2.) In their reply brief, Defendants assert that Plaintiffs "do not deny the substance of the allegations." (ECF No. 15 at 2.) However, a fair inference from the allegations of the Complaint is that since no such information was provided to Ms. Horton, the statements attributed to Westmoreland County Children's Bureau were unsupported.

As ordered, Plaintiffs proceeded with the drug screens on May 15, 2019. (Compl. ¶ 19.) Mrs. Guest provided a sample which was negative, but Mr. Guest was unable to provide a urine sample. The testing facility was closing, and the tester provided supporting documentation that Mr. Guest was present and attempted to provide a urine sample but was unable to do so. The tester wrote this information at the bottom of the form because the form itself only provided a box to indicate that the test had been "refused." (*Id.*) The tester advised Mr. Guest to return the next day to repeat the test.

On the evening of May 15, 2019, Ms. Horton arrived at Guest home accompanied by police. (Compl. ¶ 23.) According to the Complaint, she had obtained an ECA from Judge Woodruff over the phone based solely on the fact that Mr. Guest had not submitted a urine sample even though Judge McCrady's order did not state that this circumstance would constitute grounds for an ECA. (Compl. ¶ 22.) Mr. Guest showed them the form from the testing facility, which reflected his attempt to complete the drug screen. Ms. Horton called her supervisor and then told the Plaintiffs there was nothing she could do because the ECA had already issued, and she insisted that the children be immediately removed from the parents' custody. (*Id.* ¶¶ 23-24; ECF No. 8 Ex. 3.)  Thus, the children were taken from the home. (*Id.* ¶¶ 20-21; ECF No. 8 Ex. 2.)  Mr. Guest did, in fact, return as instructed for his test on May 16, 2019 and his test result was negative. (*Id.* ¶ 20.)

Plaintiffs allege that they attempted to find volunteers from their church community to take the children but were not given sufficient time to do so. (Compl. ¶ 25.) In addition, they allege that Ms. Horton was clearly aware that J.G. (then two months old) was being breast fed by Mrs. Guest. (*Id.* ¶ 26.)  Despite this knowledge, Ms. Horton forcibly removed the children from the home that evening and placed them in foster care in Butler County. (*Id.* ¶ 27.) After the

children were taken, Mrs. Guest sent text messages to Ms. Horton in which she noted that Ms. Horton had not returned her messages and had not informed her where the children were. (*Id.* ¶ 28.)

On May 16, 2019, Defendants filed a Shelter Care Application which noted that the children had been taken and that "an ECA was obtained as it was ordered if the parents did not comply with a drug screen and other requests." (Compl. ¶ 29.) The Shelter Care Application alleged that Mr. Guest refused to complete the drug screen despite the fact that he had completed the drug screen that day and tested negative. (*Id.*)

While J.G. was in Defendants' custody, she was placed on formula instead of breast milk and developed hives, requiring hospitalization. (Compl. ¶ 30.) Ms. Horton notified Mrs. Guest via text message on May 16th that J.G. was taken to a doctor who examined her but did not prescribe any medication. Plaintiffs allege that they have never been told where J.G. received this medical attention. (*Id.* ¶¶ 31-32.)

On May 17, 2019, a hearing was held with respect to the Shelter Care Application. (Compl. ¶ 33.) The hearing officer found that both Guests ultimately tested negative and questioned why the case was there. (*Id.* ¶¶ 33-34.) As such, he returned physical custody to them. (*Id.* ¶ 34.) Plaintiffs allege that during this hearing, despite the lack of any justification and negative drug screens, Defendants arbitrarily attempted to keep the children in foster care custody. (*Id.*) At the conclusion of the hearing, Ms. Horton told Mrs. Guest "If this was any other judge, you would not have your kids." (*Id.* ¶ 35; ECF No. 8 Ex. 5.)[3]

## III.   Discussion

### A.   Standard of Review

---

[3] Citing the docket sheet for the case, Defendants state that the findings of the Hearing Officer on May 17th were affirmed later the same day by Judge McCrady. (ECF No. 8 Ex. 6 at 7.)

Several of Defendants' arguments touch upon the Court's subject matter jurisdiction to adjudicate this case. Therefore, Federal Rule of Civil Procedure 12(b)(1) provides the relevant standard of review regarding these arguments. *See Turner v. Crawford Square Apartments III, L.P.*, 449 F.3d 542, 547 (3d Cir. 2006) (*Rooker-Feldman* doctrine deprives federal court of jurisdiction); *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 693 n.2 (3d Cir. 1996) (Eleventh Amendment immunity is a subject matter jurisdiction argument); *B.S. v. Somerset Cty.*, 704 F.3d 250, 261 n.22 (3d Cir. 2013) ("Unlike a qualified immunity analysis … the question of absolute immunity can be addressed as a threshold issue.")

A Rule 12(b)(1) motion to dismiss addresses "the very power [of the court] to hear the case." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). "As the party asserting jurisdiction, [the plaintiff] bears the burden of showing that its claims are properly before the district court." *Development Fin. Corp. v. Alpha Hous. & Health Care, Inc.*, 54 F.3d 156, 158 (3d Cir. 1995).  There are two types of Rule 12(b)(1) motions: those that attack the complaint on its face and those that attack subject matter jurisdiction as a matter of fact. When considering a facial attack, "the Court must consider the allegations of the complaint as true," and in that respect such a Rule 12(b)(1) motion is similar to a Rule 12(b)(6) motion. *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006).

The remaining issues raised in the motion to dismiss are governed by Rule 12(b)(6), which provides that a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). "This requires a plaintiff to plead "sufficient factual matter to show that the claim is facially

plausible," thus enabling "the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)). While the complaint "does not need detailed factual allegations ... a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

As noted by the Court of Appeals for the Third Circuit in *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011), a 12(b)(6) inquiry includes identifying the elements of a claim, disregarding any allegations that are no more than conclusions and then reviewing the well-pleaded allegations of the complaint to evaluate whether the elements of the claim are sufficiently alleged.  If a claim "is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile."  *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008) (citation omitted).

In ruling on a Rule 12(b)(6) motion, courts generally consider only the complaint, exhibits attached thereto, and matters of public record. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). In addition, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Defendants have attached to their motion to dismiss some of the documents relating to the events that give rise to the Complaint: the petition seeking to have the children declared dependent, the report from Mr. Guest's attempt to provide a urine sample on May 15, the Confirmation of Verbal Order for Emergency Protective Custody, the Prehearing Conference Order,[4] the Shelter Care hearing memo, and the docket sheet for the case.[5] Plaintiffs have not

---

[4] Apparently, Judge McCrady's May 15, 2019 order requiring drug screening is memorialized in

challenged the authenticity of these documents, some of which are also public records, and these matters are specifically referenced in the Complaint. Therefore, they may be considered without converting the motion into a motion for summary judgment.

In their motion to dismiss, Defendants raise several legal doctrines which they assert compel dismissal of Plaintiffs' claims. In addition, they make contentions that are specific to the basis, or lack thereof, of Counts I and II of the Complaint. Each of their arguments will be addressed below.

B. The Rooker-Feldman Doctrine

Defendants assert that the *Rooker–Feldman* doctrine bars both of Plaintiffs' claims.[6] This doctrine stands for the proposition that "federal courts lack jurisdiction over suits that are essentially appeals from state-court judgments." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 166 (3d Cir. 2010). Application of the doctrine is restricted to "cases brought by state-court losers complaining of injuries caused by state-court judgments ... and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284 (2005). In order for the doctrine to apply, it must be shown that: (1) the federal plaintiff lost in state court; (2) the plaintiff is complaining of injuries caused by the state-court judgment; (3) the judgment was rendered before the federal suit was

---

the Prehearing Conference Order filed the next day (Ex. 4).

[5] Defendants have also included the Order of Adjudication and Disposition entered in the Court of Common Pleas on June 13, 2019, but Plaintiffs do not refer to this proceeding in their Complaint. Therefore, this document cannot be considered. Defendants have not supplied any documentation of what was submitted to the court on May 15 to support the ECA and Plaintiffs allege in the Complaint that Defendants have produced their file and it contains no such documentation (Compl. ¶ 29). The ECA itself (Ex. 3) states only that "sufficient evidence" was presented to prove that the children should be kept in foster care, but does not explain what this evidence was. Finally, the Shelter Care Application has not been provided.

[6] *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments. *Great W. Mining*, 615 F.3d at 166 (internal quotation marks omitted) (quoting *Exxon Mobil*, 544 U.S. at 284). "The second and fourth requirements are the key to determining whether a federal suit presents an independent, non-barred claim." *Id.* at 166.

Defendants contend that Plaintiffs are seeking review of the May 15, 2019 ECA and the June 13, 2019 order that found the children dependent (but allowed them to be returned to their parents' physical custody). Plaintiffs counter that they are not seeking review of these state judgments, but rather, are challenging Defendants' constitutional violations in removing the children. In fact, they note, they did not "lose" in state court—at the shelter care hearing on May 17, 2019, they regained custody of their children. Moreover, they note, the June 13, 2019 proceeding is not even referenced in the Complaint.

The form of relief sought is relevant to the resolution of this issue. In *B.S. v. Somerset County*, 704 F.3d 250 (3d Cir. 2013), a mother filed suit in federal court after a county CYS obtained an order from a state court judge transferring custody of her daughter to her father. The mother did not bring a claim for injunctive relief or seek to reverse the custody order. Instead, she only sought damages related to alleged substantive and procedural due-process violations. The court stated that "because the injury Mother claims is likewise traceable to Appellees' actions, as opposed to the state court orders those actions allegedly caused, we reject Appellees' contention that the *Rooker-Feldman* doctrine precludes federal jurisdiction in this case." *Id.* at 259. Therefore, the court held, her claim was not barred by the *Rooker-Feldman* doctrine. *Id.* at 260.

Similarly, Plaintiffs do not seek injunctive relief overturning the ECA or the June 13, 2019 order, the latter of which is not even mentioned in the Complaint. Instead, they assert

claims and seek damages which are alleged to arise from Defendants' actions, particularly the representations by Ms. Horton to the court which resulted in the issuance of the ECA and the removal of the children. As such, they claim to be injured as a result of Defendants' conduct. Therefore, the *Rooker-Feldman* doctrine does not bar this Court's jurisdiction over the matter.

   C.   Eleventh Amendment Immunity

   In their motion to dismiss, Defendants also contend that Allegheny County is entitled to Eleventh Amendment immunity regarding both of Plaintiffs' claims. In discussing Eleventh Amendment immunity, the Supreme Court has stated that "federal jurisdiction over suits against unconsenting states was not contemplated by the Constitution when establishing the judicial power of the United States."  *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996) (internal citation omitted). Therefore, unless an exception applies, a federal court lacks jurisdiction over a lawsuit involving a state or a state official. *Christ the King Manor, Inc. v. Secretary U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 318 (3d Cir. 2013). A party raising an Eleventh Amendment immunity challenge to jurisdiction bears the burden of proving that it applies. *Christy v. Pennsylvania Turnpike Comm'n*, 54 F.3d 1140, 1144 (3d Cir. 1995).

   Plaintiffs have brought suit against Allegheny County, not OCYF.  As a general matter, Eleventh Amendment immunity does not extend to counties or county agencies. *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977). Defendants contend, however, that because every Pennsylvania county is required to have a children and youth office and because these agencies have no autonomy, they should be considered "arms of the state" for Eleventh Amendment immunity purposes.

   In evaluating whether an entity is an arm of the state for Eleventh Amendment immunity purposes, the Court of Appeals for the Third Circuit has analyzed three factors: 1) whether

payment of a judgment resulting from the suit would come from the state treasury; 2) the status of the entity under state law; and 3) the entity's degree of autonomy. *Chisolm v. McManimon*, 275 F.3d 315, 323 (3d Cir. 2001) (citing *Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989) (en banc)). The Court of Appeals recently emphasized that none of the three *Fitchik* factors is "predominant." Rather, each of the factors is considered "co-equal," and "on the same terms." *Karns v. Shanahan*, 879 F.3d 504, 513 (3d Cir. 2018) (citing *Cooper v. Southeastern Pa. Transit Auth.*, 548 F.3d 296, 301 (3d Cir. 2008), and *Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233, 240 (3d Cir. 2005)).

The Court of Appeals has established a three-part test to assess the funding factor. The court must consider: 1) a state's legal obligation to pay a money judgment entered against the entity; 2) whether the agency has the money to satisfy the judgment; and 3) whether there are specific statutory provisions that immunize the state from liability for money judgments. *Patterson v. Pa. Liquor Control Bd.,* 915 F.3d 945, 950-51 (3d Cir. 2019).

With respect to the assessment of an entity's status under state law, the Court of Appeals has established a four-part subfactor test: 1) how state law generally treats the agency; 2) whether the agency can sue or be sued in its own right; 3) whether the agency is separately incorporated; and 4) whether it is immune from state taxation. *Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 230 (3d Cir. 2006).

As Plaintiffs note, Judge Gibson of this Court recently issued a decision that comprehensively addresses the issue of whether Jefferson County Children and Youth Services ("the Agency") was entitled to Eleventh Amendment immunity under these factors. Finding that it was not entitled to immunity, Judge Gibson noted that:

> As an initial matter, the Court is persuaded by a long line of Supreme Court precedent holding that county entities, like the Agency, are not immune to suit

under the Eleventh Amendment. Further, the three *Fitchik* factors [do not] weigh in favor of Eleventh-Amendment immunity. First, it does not appear that the Commonwealth is legally responsible for a judgment against the Agency. Second, Pennsylvania law treats the Agency as an arm of Jefferson County, not an arm of the state. And third, the Agency is autonomous because its operations are controlled by Jefferson County and it is not accountable to Pennsylvania's legislature or governor. Therefore, the Eleventh Amendment does not bar Plaintiff's suit against the Agency.

*Meredith v. County of Jefferson*, 2019 WL 1437821, at *16 (W.D. Pa. Apr. 1, 2019).

Defendants rely upon three cases that are contrary to the holding in *Meredith*: *Wattie-Bey v. Attorney Gen. Off.*, 424 F. App'x 95, 98 n.2 (3d Cir. 2011); *Ciprich v. Luzerne Cty.*, 2017 WL 3782786, at *8 (M.D. Pa. Mar. 24, 2017); and *Dortch v. York Cty. Children & Youth*, 2017 WL 6383074, at *8 (M.D. Pa. Dec. 6, 2017). As Judge Gibson noted in *Meredith,* however, these decisions are not persuasive for several reasons, including the fact that they fail to include any analysis of the *Fitchik* factors or how Pennsylvania statutes treat county level children and youth services agencies.  Therefore, Judge Gibson concluded, the findings in these cases "do not trump the well-settled precedent holding that counties and county agencies, like the Agency here, are not entitled to Eleventh-Amendment immunity." *Meredith*, 2019 WL 1437821, at *13 (footnote omitted).

Applying the *Fitchik* factors to this case, there is no evidence that the Commonwealth of Pennsylvania would be required to pay any judgment against the County or that the County lacks sufficient funds to satisfy a judgment.  Similarly, OCYF is treated by Pennsylvania law as an arm of Allegheny County, not the state. Indeed, as Defendants note, "any judgment would be paid by Allegheny County" and "OCYF can neither sue or be sued on its own, but Allegheny County can sue or be sued." (ECF No. 9 at 17.)

Regarding the third *Fitchik* factor, Defendants assert that OCYF has no autonomy because Pennsylvania law, specifically, the Child Protective Services Law and the Department of

Human Services regulations adopted pursuant to that statute, require counties to establish child protective services and investigate suspicions of child abuse. In *Meredith*, Judge Gibson noted that, although Pennsylvania law requires counties to establish child-welfare agencies and set out the general goals for them, "the statutory scheme leaves significant control over their organization and functioning to the individual counties. *Id.* at *15. That includes the fact that Pennsylvania law gives county commissioners the power to establish and oversee children and youth services programs, and that neither the governor nor the General Assembly control the personnel that counties select to lead their agencies, have the power to appoint officials to the agency or veto the agency's decisions. "Therefore, the Agency is 'highly autonomous,' which weighs strongly against Eleventh-Amendment immunity." *Id.*

Therefore, Defendants have not met their burden to demonstrate that Allegheny County is entitled to Eleventh Amendment immunity.

### D.  Substantive Due Process Claim (Count I)

In Count I, Plaintiffs allege that Defendants violated their substantive due process right to familial integrity by removing the children from the home without a reasonable suspicion of abuse or neglect and by placing J.G., who was being breast fed, in a foster home where she received formula and developed an allergic reaction for which she was hospitalized. Defendants argue that the facts as alleged fail to state a claim.

The Supreme Court has recognized a "fundamental liberty interest of natural parents in the care, custody, and management of their child." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). However, this Fourteenth Amendment liberty interest must be balanced against the government's compelling interest to protect children, and "does not include a right to remain free from child abuse investigations." *Croft v. Westmoreland County Children & Youth Servs.*, 103

13

F.3d 1123, 1125 (3d Cir. 1997).[7] On the other hand, the government has "no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Id.* at 1125-26. Absent reasonable suspicion, the coerced removal of children from their parents is an "arbitrary abuse[] of power" that violates substantive due process rights under the Fourteenth Amendment. *Id.* at 1126.

Defendants make several arguments in support of their motion to dismiss Plaintiffs' substantive due process claim.

### 1.  Sufficiency of Allegations

Defendants first contend that removing the children in a situation in which the family was known to have a history of domestic violence and had received information that Mr. Guest "refused" to take a drug test cannot be described as "the most egregious official conduct" that "shocks the conscience." *Miller v. City of Phila.*, 174 F.3d 368, 375 (3d Cir. 1999). They cite *Hatfield v. Berube*, 714 F. App'x 99 (3d Cir. Sept. 29, 2017), in which the court held that even if the caseworker's investigation was not thorough, as the plaintiff alleged, it could not conclude that her conduct shocked the conscience, especially in light of other undisputed evidence indicating that the children were potentially unsafe. *Id.* at 105.

Defendants also cite *J.R. v. Lehigh County*, 534 F. App'x 104 (3d. Cir. Aug. 2, 2013), in which caseworkers obtained an emergency *ex parte* court order to have minor children removed from their parents' home after one of the children reported an incident of sexual abuse to her teacher. The court held that, in light of the family's history with CYS and this report, the removal

---

[7] In their brief, Plaintiffs also cite authority that parents' association with their children is a relationship that triggers protection under the First Amendment. *D.M.*, 929 F. Supp. 2d at 399 (citing *Winston by Winston v. Children & Youth Servs. of Del. Cty.*, 948 F.2d 1380, 1390 (3d Cir. 1991)). However, they have not pleaded a claim under the First Amendment.

was not "conscience shocking" even though it was later learned that the story had been made up. The court also rejected the claim that one of the children had been wrongfully placed in a foster home in where he was exposed to allergens because the uncontested evidence showed that CYS had informed the foster parents of the child's allergies, the foster parents had obtained his medication and the exposure to allergens was limited because he was returned to his natural parents within days. *Id.* at 110.

Similarly, Defendants contend that Ms. Horton's act of seeking removal of the children based on Mr. Guest's failure to complete the drug screen was not "conscience shocking," especially since the Guests' children were returned to them within two days. (ECF No. 9 at 11) (citing *Mammaro v. New Jersey Div. of Child Protection & Permanency*, 814 F.3d 164, 169-71 (3d Cir. 2016)). In *Mammaro,* the court held that it was not clearly established that a child protective agency would violate the substantive due process clause by removing a child temporarily from a home based upon allegations of neglect, two positive drug tests and the mother's act of removing the child from supervised housing without notice or permission. The court contrasted the situation with the facts of *Croft*, 103 F.3d at 1126-27, in which a caseworker followed up on "six-fold hearsay report by an anonymous informant" of child abuse, uncovered no evidence of child abuse yet still threatened to remove the child that night. The court in *Croft* stated that, before separating parent and child, caseworkers need "some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Id.* at 1124. The court concluded that the caseworker lacked objectively reasonable evidence of abuse and that the separation of parent and child was an arbitrary use of government power. *Id.* at 1127.

Based on the allegations of the Complaint, this case is more akin to *Croft* than *Mammaro.*

Whether there was reasonable evidence of abuse or violence is an issue of fact that cannot be decided as a matter of law based upon the facts alleged in the Complaint. OCYF originally had petitioned for the children to be deemed dependent, a hearing was conducted on May 15, 2019, and the children were not removed from their parents' custody. The only additional information OCYF received later that day was that Mr. Guest had "refused" to complete a drug screen, which was not identified by Judge McCrady as a basis for seeking an ECA. As Plaintiffs point out, OCYF also knew that Mrs. Guest had tested negative for drugs. Further, Ms. Horton allegedly provided false information in her original petitions and in the context of obtaining the ECA. Thereafter, OCYF insisted that the children be removed from the home on the evening of May 15th in the absence of any new evidence of physical abuse or partner violence and despite an explanation from Mr. Guest about the circumstances surrounding his inability to be tested. Further, despite her knowledge that J.G. was being breast fed, Ms. Horton placed J.G. in foster care where she was given formula, developed an allergy to the formula and required hospitalization.

Under all of these facts, a reasonable person could construe these actions as conscience shocking and without a reasonable basis. Based on the circumstances as alleged in the Complaint, it remains an issue of fact as to whether Ms. Horton had reasonably objective evidence of abuse or neglect when she applied for the ECA on May 15, 2019 or when she executed it that night to remove the children from the home. Therefore, Plaintiffs have stated a claim in Count I that the separation of parents and children was an arbitrary use of government power.

Therefore, the allegations of the Complaint are sufficient to state a claim.

2.   Absolute Immunity

Defendant Horton contends that as an OCYF caseworker, she is entitled to absolute immunity for the actions she allegedly took in this case.  She asserts that all of her actions were in a prosecutorial capacity because they related to the removal of the children from the home based upon accusations of neglect or abuse. Plaintiffs counter that her actions were unauthorized and were investigatory, not prosecutorial, and therefore, absolute immunity does not bar their claims against her.

The Supreme Court has held that "public officials who perform 'special functions,'" such as prosecutors, are entitled to absolute immunity under certain circumstances. *Yarris v. County of Del.*, 465 F.3d 129, 135 (3d Cir. 2006) (quoting *Butz v. Economou*, 438 U.S. 478, 508 (1978)). In *Ernst v. Child & Youth Servs. of Chester County*, 108 F.3d 486 (3d Cir. 1997), the Third Circuit Court of Appeals concluded that "child welfare workers and attorneys who prosecute dependency proceedings on behalf of the state [are] absolute[ly] immun[e] from suit for all of their actions in preparing for and prosecuting such dependency proceedings." *Id.* at 488-89.[8] As noted by the court, because child welfare employees perform functions in dependency proceedings that are closely analogous to the functions performed by prosecutors in criminal proceedings, the public policy considerations are comparable and dependency proceedings incorporate important safeguards that protect citizens from unconstitutional actions by child welfare workers. *Id.* at 495.

The *Ernst* court noted, however, that its holding relates only to actions taken by child welfare workers in the context of dependency proceedings, and that it was unwilling to accord absolute immunity to "investigative or administrative" acts of child welfare workers outside the

---

[8] The Supreme Court has never approved granting social workers or child welfare workers absolute immunity. *See Hoffman v. Harris*, 511 U.S. 1060 (1994) (Thomas, J., dissenting from denial of certiorari and surveying related law review articles and case law to criticize such grants of immunity for lacking an appropriate basis at common law prior to the enactment of § 1983).

context of judicial proceedings. *Id.* at 497 n.7.

In the *B.S.* case, the Court of Appeals further analyzed the issue of absolute immunity in

the child welfare context:

> Still, absolute immunity is "strong medicine, justified only when the danger of [officials' being] deflect[ed from the effective performance of their duties] is very great." *Forrester v. White,* 484 U.S. 219, 230, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988) (alterations in original) (citation and internal quotation marks omitted). Moreover, officials who "seek exemption from personal liability" on that basis bear "the burden of showing that such an exemption is justified by overriding considerations of public policy." *Id.* at 224, 108 S.Ct. 538. Thus, "[i]n light of the Supreme Court's 'quite sparing' recognition of absolute immunity ..., we begin with [a] presumption that qualified rather than absolute immunity is appropriate," unless the official invoking absolute immunity meets a "heavy burden of establishing entitlement" to it. *Odd v. Malone,* 538 F.3d 202, 207-08 (3d Cir. 2008) (citation omitted).

704 F.3d at 261-62 (3d Cir. 2013).

In the *B.S.* case, the plaintiff contended, among other things, that her daughter's removal

from the home represented a substantive due process violation because the case worker

manipulated and misrepresented facts to the court in order to convince the court that removal

was necessary. The immunity analysis of the Court of Appeals focused on the specific function

served by these actions, that is, whether these actions were prosecutorial on one hand or

administrative or investigative on the other. The court noted that this raised the "question of

precisely where to draw the line between a child welfare employee's investigation and

prosecutorial functions, an issue that is not clearly addressed by our holding in *Ernst*." *Id.* at 267.

However, the Third Circuit did not reach that issue because even if it concluded that the

defendant was not entitled to absolute immunity, plaintiff's claim failed because no rational jury

could find that the removal violated the mother's due process rights: the caseworker had acted

quickly upon information from a physician who had been treating the daughter over the course of

several month and who told her of medical evidence that indicated serious neglect. *Id.* at 268.

The Court of Appeals has also stated that obtaining dismissal based on absolute immunity "should not be easy travel. Once asserted, the onus is on the prosecutor to demonstrate 'that absolute immunity should attach to each act he allegedly committed that gave rise to a cause of action.'" *Fogle v. Sokol*, 957 F.3d 148, 160 (3d Cir. 2020) (quoting *Light v. Haws*, 472 F.3d 74, 80 (3d Cir. 2007)). The burden is uniquely heavy because "in a motion to dismiss, 'it is the defendant's conduct *as alleged in the complaint* that is scrutinized.'" *Id.* at 161 (quoting *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)). In *Fogle*, the court granted the prosecutors' absolute immunity for some actions (failing to report inconsistencies in witness' past statements, withholding exculpatory evidence) but not for others (procuring statements from suspects, obtaining arrestee's brother's statements, encouraging state troopers to fabricate statements).

Plaintiffs allege that Ms. Horton falsely represented that she obtained information from the Westmoreland County Children's Bureau in an effort to "beef up" her petitions because she had no other information about abuse or neglect of the children, and a fair reading of the Complaint suggests that Plaintiffs allege that the information she submitted in her petitions was false. These actions were conducted in Ms. Horton's investigative capacity and led to Judge McCrady's order, which included a requirement that Plaintiffs obtain drug tests. Thus, drawing every possible inference from the Complaint, it is possible that absent a faulty or deliberately false investigation, that order would not have been entered in the first instance.

Significantly, Plaintiffs allege that the order did not require removal of the children if the tests were positive; only if new allegations of partner violence or physical abuse occurred. Moreover, Plaintiffs claim, there is no evidence that Ms. Horton conducted any additional investigation into any physical abuse, partner violence, the circumstances surrounding Mr. Guest's inability to provide a urine sample or indeed, the actual need for an ECA. Instead,

according to Plaintiffs, she deliberately misrepresented the underlying circumstances to Judge Woodruff, who had not been involved in the previously proceedings, in order to obtain the ECA. (Compl. ¶ 22.) This is alleged to have included falsely representing the contents of Judge McCrady's order. Once she obtained the ECA and went to the Plaintiffs' home, Ms. Horton did not, according to Plaintiffs, make any effort to contact the judge once she was advised of the status of the drug test. Once again, this could be construed as investigative, as opposed to prosecutorial, conduct.

A prosecutor does not have absolute immunity if he makes false statements in a sworn affidavit in support of an application for an arrest warrant. *See Kalina v. Fletcher*, 522 U.S. 118, 129-30 (1997). Defendants do not contend that making false statements to the court in order to obtain an ECA is related to her "prosecutorial function." *See Yarris*, 465 F.3d at 136 ("destroying exculpatory evidence is not related to a prosecutor's prosecutorial function.") *See also Hardwick v. County of Orange*, 844 F.3d 1112, 1116 (9th Cir. 2017) (explicitly denying absolute immunity to social workers who allegedly fabricated evidence during an investigation and made false statements in a dependency petition affidavit).

As noted in *B.S.*, the question of where to draw the line between prosecutorial and investigative functions is challenging. Accepting all of Plaintiffs' allegations as true at this point, as the Court is required to do, it is premature to conclusively determine whether any of Ms. Horton's actionable conduct was investigatory or alternatively, if she was acting at all times in a prosecutorial capacity and as such, is entitled to absolute immunity. Therefore, Defendants' motion to dismiss on this basis will be denied.

      3.   Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is an objective decision to be decided by the court as a matter of law. *Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir. 2004). The burden of pleading a qualified immunity defense rests with the defendant, not the plaintiff. *Thomas v. Independence Township*, 463 F.3d 285, 293 (3d Cir. 2006).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The ultimate question is whether the state of the law when the offense occurred gave Horton "fair warning" that her acts were unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

The court should look first to applicable Supreme Court precedent. "Even if none exists, it may be possible that a 'robust consensus of cases of persuasive authority' in the Court[s] of Appeals could clearly establish a right for purposes of qualified immunity." *Mammaro*, 814 F.3d at 169 (quoting *Taylor v. Barkes*, 135 S.Ct. 2042, 2044 (2015)).

Defining the right at issue is critical to this inquiry. The court must frame the right "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The dispositive question is whether the violative nature of particular conduct is clearly established." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015). But this does not mean that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful. The Supreme Court has explained that, "[a]lthough earlier

cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope*, 536 U.S. at 741. Indeed, the Court has made clear that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.*

The allegations of the Complaint, accepted as true, support a conclusion that based upon the state of the law at the relevant time frame, a reasonable person would have known that her conduct violated clearly established constitutional rights. On May 15, 2019, Ms. Horton sought to declare the children dependent solely based upon Mr. Guest's inability to provide a urine sample even though she knew that Judge McCrady's order limited the instruction to obtain an ECA only if there were new allegations of partner violence or physical abuse. She also knew that there were no new allegations of abuse or violence after the issuance of Judge McCrady's. Moreover, at this juncture, what Ms. Horton communicated to Judge Woodruff in order to obtain the ECA is unknown.

Therefore, Ms. Horton is not entitled to qualified immunity based on the allegations of the Complaint.

4.  Municipal Liability

Defendants argue that to the extent Plaintiffs are basing their claims on a theory of vicarious liability, their claim against Allegheny County fails as a matter of law because the County cannot be vicariously liable for the unconstitutional acts of its employees. *Monell v. Department of Social Servs. of N.Y.*, 436 U.S. 658, 694 (1978); *Groman v. City of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995). Rather, they contend, it can only be liable under § 1983 if it maintained a policy, practice or custom that harmed Plaintiffs. *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996).

Plaintiffs have alleged that OCYF maintained policies, practices and customs that harmed them, and they specifically point to the fact that Ms. Horton contacted a supervisor at OCYF who instructed her to proceed with the removal of the children despite the existing circumstances. *See D.M. v. County of Berks*, 929 F. Supp. 2d 390, 400 (E.D. Pa. 2013) (plaintiffs provided a basis for municipal liability by alleging, inter alia, that policymaking officials acquiesced in all the actions taken). Accepting these allegations, as the Court must for purposes of a motion to dismiss, Plaintiffs have pleaded a basis for imposing municipal liability on Allegheny County.

E. Procedural Due Process Claim (Count II)

In Count II, Plaintiffs allege that their procedural due process rights were violated when the children were forcefully separated from their parents based upon false representations made in the application for the ECA and the Shelter Care Application. Defendants contend that these allegations fail to state a claim for relief.

The Supreme Court has held that a due process violation "is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *Zinermon v. Burch*, 494 U.S. 113, 126, (1990). The Court of Appeals has held that: "Initiating child custody proceedings by *ex parte* orders is generally constitutional if a prompt post-deprivation hearing is held." *Miller*, 174 F.3d at 372 n.4. The court noted that Pennsylvania law requires a hearing within 72 hours of an *ex parte* order that results in the removal of children from a home. *Id.* (citing 23 Pa. C.S. § 6315(d), 42 Pa. C.S. § 6332(a)). *See also* Pa.R.J.C.P. 1242(D) (requiring shelter care hearing to occur within 72 hours of children's removal).

In this case, the children were removed on the evening of May 15, 2019. A shelter care hearing was held before a hearing officer on the morning of May 17, 2019 which resulted in the return of the children to their parents' custody. Thus, the family received a prompt hearing well

within 72 hours of the children's removal.[9]

Plaintiffs argue that Ms. Horton mischaracterized Judge McCrady's order and separated the family without a reasonable basis. But it is uncontroverted, based upon their own allegations, that they were able to challenge this action less than two days later and their children were returned to them. Therefore, they cannot allege that they were denied procedural due process and therefore, Count II fails to state a claim upon which relief may be granted.

IV.   **Conclusion**

For the reasons cited above, Defendants' motion to dismiss will be granted with respect to Count II of the Complaint and denied with respect to Count I.

An appropriate order follows.

BY THE COURT:

s/Patricia L. Dodge_____
PATRICIA L. DODGE
United States Magistrate Judge

Dated: July 17, 2020

---

[9] In their reply brief, Defendants also contend that the procedures regarding the issuance of the ECA complied with Pennsylvania law, which allows the order to be issued orally and then reduced to writing within 24 hours. Pa.R.J.C.P. 1210(B)(3). However, that same rule also requires the application, which can be made orally, to be reduced to writing within 24 hours, Pa.R.J.C.P. 1210(A). The same procedure applies to shelter care applications—they must be reduced to writing within 24 hours. Pa.R.J.C.P. 1240(A). That did not happen here.