**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ISAAC GUEST, individually and as parent and )
natural guardian of his minor children I.G., M.G., )
S.G. and J.G, and NICOLE GUEST, individually )
and as parent and natural guardian of her minor )
children I.G., M.G., S.G. and J.G., )
                                          )
            Plaintiffs, )
                                            )
    vs )          Civil Action No. 20-130
                                            )
                                            )          Magistrate Judge Dodge
ALLEGHENY COUNTY, DESARAE HORTON, )
and JOEY MANUEL, )
                                            )
            Defendants. )

## <u>MEMORANDUM OPINION</u>

Plaintiffs Isaac Guest and Nicole Guest bring this civil rights action under 42 U.S.C. § 1983 in their individual capacities and as parents and natural guardians of their minor children, I.G., M.G., S.G. and J.G. Plaintiffs allege that their due process rights were violated when the children were removed from their custody. Named as defendants are Allegheny County, Desarae Horton ("Ms. Horton"), a caseworker for Allegheny County Office of Children Youth and Families ("OCYF") and Joey Manuel ("Ms. Manuel"), Ms. Horton's supervisor.

Currently pending before the Court are the parties' cross-motions for summary judgment (ECF Nos. 45, 48). For the reasons below, Plaintiffs' motion will be denied and Defendants' motion will be granted.

### I.   <u>Relevant Procedural History</u>

Plaintiffs commenced this action in January 2020, naming Allegheny County and Ms. Horton as defendants. Plaintiffs alleged in Count I that Defendants violated their substantive due process right to familial integrity. In Count II, they contended that Defendants violated their

procedural due process rights by obtaining an Emergency Custody Authorization ("ECA") under false pretenses. Defendants' motion to dismiss (ECF No. 8) was granted on Count II and denied with respect to Count I (ECF Nos. 18, 19). Plaintiffs later filed an Amended Complaint (ECF No. 42) which added Ms. Manuel as a defendant.

After the close of discovery, Plaintiffs filed a motion for summary judgment (ECF No. 45) which has been fully briefed (ECF Nos. 46, 57). Defendants have also moved for summary judgment (ECF No. 48), and their motion has been fully briefed as well (ECF Nos. 49, 54, 58).

## II.   **Background Facts**

### A. **OCYF Investigation**

Desarae Horton is employed as a caseworker with OCYF. Joey Manuel is her supervisor. (Plaintiffs' Statement of Material Facts in Support of Their Motion for Summary Judgment ("PSMF") ¶¶ 1-2.)[1]

On March 2, 2019, Ms. Horton went to the home of Mr. and Mrs. Guest to investigate a report of suspected child abuse. It was alleged that during an argument, Mr. Guest was injured when Mrs. Guest hit his nose with a phone charger. Mrs. Guest reportedly had their infant daughter in her arms during this incident. The report of suspected child abuse also stated that the police had been to the Guest home five times in 2019 and nineteen times previously. (Defendants' Concise Statement of Material Facts ("DCSMF") ¶¶ 1-3.)[2]

Ms. Horton sent separate letters to Mr. and Mrs. Guest scheduling an appointment on

---

[1] ECF No. 47. Plaintiffs repeat all of their Statements of Fact in a Counter Statement following their Answer to Defendants' Statement of Material Facts ("PADCSMF") (ECF No. 55 ¶¶ 103-44.) The Court will cite the PSMF except for several statements that are not included in the PSMF.

[2] ECF No. 50. A West View Police officer testified slightly differently, stating that, between January and May 15, 2019, the West View Police were called to the Guests' home twelve times related to domestic violence. (*Id.* ¶¶ 10-12; ECF No. 51-3 at 16.)

March 19, 2019 at their home. Ms. Horton went to the Guest home for the scheduled visit, but no one answered the door. Ms. Horton then spoke with Mr. Guest by telephone to reschedule the home visit.

Ms. Horton completed a home visit on April 9, 2019. (*Id.* ¶¶ 5-9.) Mr. Guest acknowledged that the phone charger incident happened but said that he was hit in the face by accident. During this home visit, they also discussed previous protection from abuse ("PFA") petitions filed by Mr. Guest against Mrs. Guest. As part of her investigation, Ms. Horton also spoke by telephone with Maryellen Wojtankowski from Westmoreland County Children's Bureau ("WCCB") on April 17, 2019, about WCCB's involvement with the Guests in 2014.

After completing her investigation, Ms. Horton participated in a meeting known as a "staffing" with Ms. Manuel, Kelly Spinner, a best practices specialist, Marsha Cooper, an Assistant County Solicitor, and Denise Lee, Ms. Manuel's supervisor. The purpose of the staffing was to discuss what action to take regarding the Guest children. As a result of this meeting, a decision was made to file a dependency petition. (*Id.* ¶¶ 14-16.)

Ms. Horton filed a dependency petition about the Guest children several days later. The petition included a paragraph regarding Ms. Horton's previous conversation with Ms. Wojtankowski about the WCCB's involvement with the Guest family in 2014. This paragraph included the following statement: "Mr. Guest acknowledged violating his probation during a domestic violence related incident with Mrs. Guest. He was reportedly on probation and was to complete court ordered ARD anger management and drug and alcohol counseling."

Neither the documents produced by Westmoreland County nor Ms. Horton's notes support these allegations, however. (PSMF ¶ 3.) During WCCB's 2014 investigation, Mr. Guest told the WCCB that he had been on probation as a result of domestic violence but was no longer

on probation. (Defendants' Reply to Plaintiffs' Counter-Statement of Material Facts ("DRPCSMF") ¶¶ 105, 149.)[3] As the record reflects, Mr. Guest was placed on ARD probation in Westmoreland County for domestic violence in August 2010. (ECF No. 60-1) He was also ordered to participate in anger management counseling. (*Id.*) Westmoreland County did, in fact, allege that he violated his probation, but its petition was later withdrawn. (*Id.*) Thus, Defendants assert that the only errors in Ms. Horton's dependency petition were that Mr. Guest's probation was not violated and his probation conditions did not include drug and alcohol counseling. (DCSMF ¶¶ 17-21.)

Ms. Horton's notes reference a conversation with Mr. Guest in which he explained that he had been on ARD probation, completed anger management counseling and was no longer on probation. (ECF No. 45-13.) Her notes about her conversation with Ms. Wojtankowski do not reference a violation of Mr. Guest's probation, court-ordered ARD, anger management or drug and alcohol counseling. (PSMF ¶¶ 4-6.) The dependency petition did not state that Ms. Horton was told by someone at Westmoreland County that Mr. Guest was on probation. Rather, it states that Mr. Guest informed her that he was on probation. (Defendants' Counter Statement of the Facts ("DCSF") ¶¶ 3-6.)[4]

**B.  The May 15, 2019 Court Proceeding**

On May 15, 2019, an adjudicatory dependency hearing was scheduled to take place before Allegheny County Court of Common Pleas Judge Jennifer McCrady. Mr. and Mrs. Guest, Ms. Horton, an Assistant County Solicitor for OCYF and the Child Advocate and Guardian Ad Litem for the Guest children were present at this proceeding. The hearing was continued, however, because Mr. and Mrs. Guest appeared without counsel but wanted to have legal

---

[3] ECF No. 59.
[4] ECF No. 56.

representation before proceeding. (DCSMF ¶¶ 26-28.)

The transcript from the proceeding includes the following colloquy:

The Court: I have serious concerns about the children being in your care, and so I really advise you to follow through and get a lawyer for the next time. Okay?

If there is no compliancy between now and then, the Agency will be directed to remove the children.

Do you understand?

Mr. Guest: Yes.

The Court: Yes?

Mrs. Guest: Yes.

(*Id.* ¶ 29; PSMF ¶ 8.) Ms. Horton heard Judge McCrady's statements. (DCSMF ¶ 30.)

The Court asked Ms. Horton if the Guests had been directed to have urine drug screens. (*Id.* ¶¶ 31-32, 34-35.) Judge McCrady then advised the Guests that: "Both parents need to have a urine screen today before you leave the courthouse and if it's positive then you'll be called randomly for screens and we'd ask you to have drug and alcohol evaluations." (*Id.* ¶ 36; PSMF ¶ 9.) Later in the proceeding, the Court reiterated to the Guests that they were to obtain urine screens that day and that random urine screens would be required if they tested positive. (DCSMF ¶¶ 38-39.) Judge McCrady also stated that: "If the Agency receives any additional reports of domestic violence or allegations of physical abuse of any of the children, then you are to get an ECA." (*Id.* ¶ 37; PSMF ¶ 11.)  Judge McCrady did not issue a written order until the next day. (DCSMF ¶ 55.)

The children were not removed from their parents' custody at this proceeding. (PSMF ¶ 7.)

### C.  The Drug Screens

Shortly after the proceeding before Judge McCrady, Ms. Horton walked to the test site with the Guests but left before the screens occurred. (PSMF ¶ 12; DCSMF ¶ 44.) Mrs. Guest completed the drug screen with negative results. (PSMF ¶ 12.) Mr. Guest testified that despite six to eight trips to the bathroom, he was unable to produce a urine sample. Daniel Zoldos, who conducted the testing, confirmed that Mr. Guest was given the opportunity to produce a urine sample a number of times. Although the testing site was open until 4:45 p.m., Mr. Guest departed at 3:30 p.m. Mr. Zoldos informed Mr. Guest that if he left without producing a urine sample it would be marked as a refusal. Mr. Zoldos did so, writing on the form that "[c]lient tried multiple times but was unsuccessful in producing a specimen. Was going to contact CW [Caseworker] about being called in at a later date. . ." (DCSMF ¶¶ 44-50.)[5] Mr. Guest testified that Mr. Zoldos told him to call his caseworker and return the next day to try to provide a sample. (PSMF ¶ 12.)

### D.  The Decision to Apply for an ECA

Later that day, Ms. Horton learned only that Mr. Guest had refused the drug screen. She did not see the form completed by Mr. Zoldos. Ms. Horton contacted Ms. Manuel and explained her understanding of Judge McCrady's verbal order. (DCSMF ¶ 56.) She informed Ms. Manuel about the proceeding before Judge McCrady as well as the fact that Mr. Guest refused his drug screen. (DCSMF ¶¶ 51-53.) Ms. Horton told Ms. Manuel that Judge McCrady had said that if there was any noncompliance before the next hearing, OCYF was to remove the children.

---

[5] Plaintiffs deny some of these statements (PADCSMF ¶¶ 47-49) but do not cite any evidence in support of their denial.

Either that day or the next day, Ms. Horton recorded in her notes that:

Father is physically able to care for the children. However, he refused to do a drug screen and Judge McCrady had ordered if any noncompliance were to occur, the children would be removed.

(*Id.* ¶ 54.) Judge McCrady's written order from the May 15, 2019 hearing had not yet been issued when Ms. Horton wrote this note. (*Id.* ¶ 55.)

After speaking with Ms. Horton, Ms. Manuel spoke with the Assistant County Solicitor Washington, who had attended the May 15, 2019 proceeding, and her supervisors, Denise Lee, a Clinical Manager, and Margaret Remele Erwine, CYF's Director for the North Regional Office. After this consultation, the decision was made to proceed with an ECA. (*Id.* ¶ 58.)

An ECA that is sought after normal court hours is presented by telephone to the on-call judge. (DCSMF ¶ 61.) Ms. Manuel applied to the on-call judge, the Honorable Dwayne Woodruff, for an ECA. Ms. Manuel does not specifically recall what she told Judge Woodruff. (*Id.* ¶¶ 58-59; DCSF ¶ 45.) The petition seeking the ECA was based entirely on Ms. Horton's verbal report of the May 15, 2019 pre-hearing conference. Defendants had not received any new allegations of domestic violence or abuse. The ECA was sought because Mr. Guest did not complete his drug screen on May 15th. (PSMF ¶¶ 16-17.)

Ms. Manuel explained that she sought an ECA because:

A. There was a court hearing that day and my understanding of the situation was that Judge McCrady had indicated that she had significant concerns about the safety of the children, that she was continuing the hearing I believe for legal representation and that if there was any noncompliance between that hearing and the next hearing, the agency was directed to remove the children and also if there were other things that occurred. My caseworker contacted me after hours, I don't remember exactly what time, and indicated that Mr. and Mrs. Guest were ordered to complete urine screens and that Mr. Guest had refused to complete his urine screen.

\* \* \* \* \*

Q. Okay. Did [Ms. Horton] tell you that the Judge told her that if there is any noncompliance with the Order whatsoever that the kids are to be removed?

A. She indicated to me that Judge McCrady said between now and the next hearing if there is any noncompliance that the agency would be directed to remove the children.

* * * * *

Q. You gave me an if situation. If they didn't do something, then the County would be directed to take the children. So my question is: Were you directed to take the children by someone?

A. By Judge McCrady. Her verbal order at the hearing was if there was any noncompliance between that hearing and the continued hearing that the agency would be directed to remove the children.

(DCSMF ¶ 60.)

Judge Woodruff issued a verbal ECA Order that authorized Ms. Manuel or any law enforcement officer to take the children into custody. (DCSF ¶ 28.) The ECA Acknowledgement form, which is prepared by Allegheny County, states that the County is authorized by the ECA to investigate further the circumstances and if, in fact, the children are in imminent danger, they can be removed. (ECF No. 45-9.)

Ms. Horton was trained that Allegheny County's policy is that children are to be removed if an ECA is issued. Further, she was instructed to call her supervisor when executing an ECA if any issues arose. Both Ms. Manuel and her superior, Denise Lee, confirmed this policy and practice. (PSMF ¶¶ 19-21.)  According to Defendants, this practice is also known to the Court of Common Pleas.

### E.  The Execution of the ECA

After the ECA was issued, Ms. Horton arranged for Elizabeth Holtz, another caseworker, to accompany her to the Guest home to assist with transportation because there were four children who needed car seats. The West View Police were also present. (DCSMF ¶¶ 64-66, 68.)

8

They observed nothing at the Guest home that suggested that the children were in imminent danger. (PSMF ¶¶ 22-23.)

Ms. Horton provided Mr. Guest with a copy of the ECA and talked with the Guests about the reason for the ECA. (DCSMF ¶¶ 69-71.) When Ms. Horton advised Mr. Guest that the ECA was based on his refusal of the drug test, Mr. Guest explained what occurred and denied refusing the test. (PSMF ¶ 24.) Mr. Guest also provided Ms. Horton with the document from the drug testing facility stating that he was unsuccessful in producing a urine specimen. (DCSMF ¶¶ 73-74.) Ms. Horton called Ms. Manuel and advised her about Mr. Guest's statements. They did not talk about whether the children were in any danger. (PSMF ¶¶ 24-25.) Ms. Manuel instructed her to proceed with the removal of the children because the ECA had been issued. (DCSMF ¶¶ 75-76.) Ms. Horton is required to follow Ms. Manuel's instruction. (PSMF ¶ 26.)

The parties dispute whether Ms. Horton told Mrs. Guest that the children could remain with her if she left the residence, but she would not leave. (DCSMF ¶ 72.) Ms. Horton testified that she did not recall whether she offered this option. Mr. Guest denies that she offered this option. (PADCSMF ¶ 72.)[6] Ms. Horton gave Mr. and Mrs. Guest about an hour to locate friends or family to care for the children, rather than placing them in foster care, but the Guests could not do so. (DCSMF ¶¶ 77-78.) The caseworkers tried to assist the Guests to find someone who could take the children. (*Id.* ¶ 67.) Ms. Horton could not wait any longer because it was late and the children had to receive physicals that evening. (*Id.* ¶ 80.)

---

[6] Ms. Holtz testified that Ms. Horton offered Mrs. Guest the ability to stay with the children but she refused. (ECF No. 51 Ex. 22 at 15:7-18.) Ms. Horton's notes from that evening, which are extensive, do not mention this discussion. (ECF No. 51 Ex. 2 at 9.) Ms. Manuel testified that this was an important piece of information that should have been in Ms. Horton's notes. (ECF No. 45 Ex. 2 at 33:5-12.)

Ms. Horton found no immediate safety concerns based on the children's surroundings. The only reason the children were taken into custody was because Mr. Guest had not completed his drug test. By proceeding to remove the children from the home, Ms. Horton asserts that she was "following a directive." When Ms. Manuel was asked if there was an emergency that required the children to be removed from their parents because they were in imminent danger, she responded: "We followed a Court Order... We followed a verbal Court order." (PSMF ¶¶ 27-33.) Ms. Manuel did not know of any imminent safety threat. (*Id.* ¶ 35.)

Margaret Remele Erwine, OCYF's Director for the North Regional Office, described Allegheny County's practice once an ECA is issued. Except in a very rare situation, children are taken into shelter care pending a hearing before the court. The reason for the practice is that:

> . . . if an ECA is requested and granted, there has been enough information provided to request and grant that ECA. I could say there could be an occasion where an ECA is granted -- or an ECA is requested, an ECA is granted, a caseworker or supervisor reports to the scene or the situation and it is determined that the ECA is no longer needed, there could be an opportunity to not execute an ECA. It's extremely rare. Because if we are at the point where we are requesting an ECA and the information that is relayed to the court is then, therefore, granted to obtain the ECA, it's then executed, and then the shelter hearing is held at the next date that the court is available for shelter hearings.

(DCSMF ¶¶ 95-97.) Ms. Horton, Ms. Manuel and Ms. Lee all testified that if an ECA is issued, they must execute it. (PADCSMF ¶¶ 96-97, 101.) Ms. Horton testified that she received no training that additional investigation was required after an ECA is issued to ensure that the child or children are only taken into custody if there is imminent danger because of the surroundings. (*Id.* ¶ 102.)

Ms. Lee, Ms. Manuel's supervisor, explained that removing the children from their mother "was not about right or wrong. It's about presenting the information and following the Judge's Order." (*Id.* ¶¶ 145-47.) In directing Ms. Horton to execute the ECA despite Mr. Guest's

claim that he did not refuse the drug test, Ms. Manuel indicated that she was acting according to an OCYF practice that she used at least 200 times and had no reason to believe was incorrect, let alone unconstitutional. (DRPCSMF ¶ 150.)

Ms. Horton and Ms. Holtz transported the children to Children's Hospital of Pittsburgh for a medical examination. After the examination, the children were taken to foster care by other OCYF personnel. (DCSMF ¶¶ 79-81; DRPCSMF ¶ 151.) While in foster care, the youngest child, who had been breast feeding, had an allergic reaction to formula and was seen by medical personnel. (DCSMF ¶ 82; PSMF ¶ 36.)

### F.  Subsequent Events

The next day, on May 16, 2019, Judge McCrady issued a written Pre-Hearing Conference Order that stated in relevant part: "Parents have screens today [May 15, 2019] if positive referred for D&A [drug and alcohol] evaluation. If any new allegations of [interpersonal violence] or physical abuse allegations are received by OCYF-OCYF to obtain an ECA." (PSMF ¶ 15; DCSF ¶ 15.)

Mr. Guest returned to the testing facility on May 16, 2019 and submitted to a drug screen, which was negative. (DCSMF ¶ 87.)

Despite her knowledge of the substance of Judge McCrady's written Order, Ms. Horton stated in the Shelter Hearing Petition that: "An ECA was obtained as it was court ordered if parents did not comply with obtaining a drug screen and other requests. Isaac Guest refused to complete the drug screen. Children were placed in a TRAC [Three Rivers Adoption Council] foster home." (PSMF ¶ 38.) By the time she prepared the shelter petition Ms. Horton knew that Mr. Guest had passed a drug screen on May 16, 2019. When Ms. Horton and Ms. Manuel reviewed Judge McCrady's Order before the hearing on the shelter petition, they discussed the

fact that the Order said nothing about obtaining an ECA if drug screening was not completed. (PSMF ¶ 37.)

On May 17, 2019, Judge Woodruff issued a Confirmation of Verbal Order for Emergency Protective Custody. It confirmed the Court's previous verbal order, granted OCYF's application and authorized OCYF "to investigate further the surroundings of the above-named child and to take the child into custody if the child is in imminent danger from his/her surroundings or has run away from his or her custodian." (ECF No. 51 Ex. 26.)

The same day, a shelter hearing was held before Hearing Officer Mark Cancilla to determine if the children would remain in foster care. Mr. and Mrs. Guest were represented by separate attorneys. The Guest children were represented by a Guardian Ad Litem. Both Mr. and Mrs. Guest testified at the hearing, as did Ms. Horton, and the fact that Mr. Guest had completed a negative drug test was verified. (DCSMF ¶¶ 84-87.)

Ms. Horton testified at the May 17, 2019 hearing that the reason drug testing was an issue was because "there is a report in Westmoreland County." (PSMF ¶ 40.) Defendants deny that Ms. Horton's statement "was intentionally false, even if it was incorrect." (DCSF ¶ 40.)

At the hearing, Defendants sought to keep the children in OCYF custody until at least May 31, 2019. (PSMF ¶ 39; DCSF ¶ 39.) The County sought to keep the children in foster care because Mr. and Mrs. Guest would not acknowledge issues in their home and would not comply with OCYF's services. OCYF wanted the Court to encourage the Guests to alleviate the circumstances that were causing issues in their home. (*Id.* ¶¶ 41-42.) The Guardian Ad Litem also recommended to the hearing officer that the children remain in foster care. (DCSMF ¶ 88; ECF No. 45 Ex. 15 at 31:2-5.)

At the conclusion of the hearing, Hearing Officer Cancilla returned the legal and physical custody of the children to the Guests under the supervision of OCYF. (DCSMF ¶¶ 89, 91.) While noting his conclusion that Mr. Guest refused the court ordered drug screen, he stated that:

> I'm not sure that that in and of itself is sufficient. It's not something that the Judge specifically indicated that you needed to do. It wasn't her indication about getting an ECA [which] had something to do with or had everything to do whether or not there were new allegations of either interpersonal violence or physical abuse allegations.

(PADCSMF ¶ 90.)  Nonetheless, he ordered random drug screens by the Guests. (ECF No. 51-15 at 2.)

The subsequent Recommendation for Shelter Care issued by Hearing Officer Cancilla states, in relevant part, that "the Court finds that to allow this child to remain in the home would be contrary to the child's welfare, and that Reasonable Efforts were made by the Allegheny County Office of Children, Youth and Families to prevent or eliminate the need for removal of this child from the home."  (ECF No. 51-15 at 1.)

On June 13, 2019 an adjudicatory hearing was conducted before Judge McCrady and an Order of Adjudication and Disposition was entered by her. The Court found that clear and convincing evidence substantiated the allegations in the petition. Her order also stated:

> After consideration of the evidence, it is ORDERED that the Child is found, by clear and convincing evidence, to be a Dependent Child pursuant to:
> (1) The child is without proper care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals.

(DCSMF ¶¶ 92-93.) Judge McCrady determined that legal custody of the children would remain with OCYF, that physical custody would remain with the parents and that the children were "safe in the current placement setting." (ECF No. 51 Ex. 16.) The court also ordered drug and alcohol testing for Mr. and Mrs. Guest. (DCSMF ¶ 94.)

Several months later, the Guest family dependency case was transferred to Westmoreland County. (DCSMF ¶ 99.)

## III.   Discussion

### A.  Standard of Review

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the lack of a genuine issue of material fact.

Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *Nat'l State Bank v. Federal Rsrv. Bank,* 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Fam. YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of*

*Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001)

**B. Substantive Due Process Claim**

1. Absolute Immunity

Plaintiffs allege that Defendants violated their substantive due process right to familial integrity. Their claim is based on Defendants' removal of the children from the home without a reasonable suspicion of abuse or neglect, not allowing the Guests sufficient time to make arrangements with family or friends before placing the children in foster care and placing the youngest child, who was breast feeding, in a foster home where she received formula and developed an allergic reaction for which she was hospitalized. Defendants assert that they took appropriate actions at each step of this process.

In their summary judgment motion, Defendants contend that Ms. Horton and Ms. Manuel are entitled to absolute immunity for the actions they took in this case. They assert that their actions were taken in a prosecutorial capacity because they related to the adjudicative process associated with the removal of the children from the home. Plaintiffs counter that because the actions of Ms. Horton and Ms. Manuel were unauthorized, investigatory in nature and based on false statements, they are not absolutely immune.

The Supreme Court has held that "public officials who perform 'special functions,'" such as prosecutors, are entitled to absolute immunity under certain circumstances. *Yarris v. County of Del.*, 465 F.3d 129, 135 (3d Cir. 2006) (quoting *Butz v. Economou*, 438 U.S. 478, 508 (1978)). In *Ernst v. Child & Youth Servs. of Chester Cnty.*, 108 F.3d 486 (3d Cir. 1997), the Third Circuit concluded that "child welfare workers and attorneys who prosecute dependency proceedings on behalf of the state [are] absolute[ly] immun[e] from suit for all of their actions in preparing for and prosecuting such dependency proceedings." *Id.* at 488-89. As noted by the court, because

child welfare employees perform functions in dependency proceedings that are closely analogous to the functions performed by prosecutors in criminal proceedings, the public policy considerations are comparable and dependency proceedings incorporate important safeguards that protect citizens from unconstitutional actions by child welfare workers. *Id.*

The *Ernst* court held that this immunity not only applies to the presentation of recommendations to a court, but also applies to the "gathering and evaluation of information" to formulate those recommendations and the exercise of independent judgment in deciding to bring a proceeding. *Id.* at 495. Otherwise, exposing caseworkers to potential liability for the process that led to their recommendations "would eviscerate the immunity they did receive and undermine the purposes sought to be advanced by the grant of absolute immunity." *Id.* at 498.Nonetheless, the *Ernst* court's holding related only to actions taken by child welfare workers in the context of dependency proceedings, as the Third Circuit was unwilling to accord absolute immunity to "investigative or administrative" acts of child welfare workers outside the context of judicial proceedings. 108 F.3d at 497 n.7.

The Court of Appeals further discussed the issue of absolute immunity in the child welfare context in the case of *B.S. v. Somerset County Child. & Youth Servs.*, 704 F.3d 250 (3d Cir. 2013):

> Still, absolute immunity is "strong medicine, justified only when the danger of [officials' being] deflect[ed from the effective performance of their duties] is very great." *Forrester v. White,* 484 U.S. 219, 230, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988) (alterations in original) (citation and internal quotation marks omitted). Moreover, officials who "seek exemption from personal liability" on that basis bear "the burden of showing that such an exemption is justified by overriding considerations of public policy." *Id.* at 224, 108 S.Ct. 538. Thus, "[i]n light of the Supreme Court's 'quite sparing' recognition of absolute immunity ..., we begin with [a] presumption that qualified rather than absolute immunity is appropriate," unless the official invoking absolute immunity meets a "heavy burden of establishing entitlement" to it. *Odd v. Malone,* 538 F.3d 202, 207-08 (3d Cir. 2008) (citation omitted).

*Id.* at 261-62 (3d Cir. 2013).

In the *B.S.* case, the plaintiff contended, among other things, that her daughter's removal from the home represented a substantive due process violation because the case worker manipulated and misrepresented facts to the court to convince it that removal was necessary. The immunity analysis of the Court of Appeals focused on the specific function served by these actions, that is, whether these actions were prosecutorial as opposed to administrative or investigative in nature. The court noted that this raised the "question of precisely where to draw the line between a child welfare employee's investigation and prosecutorial functions, an issue that is not clearly addressed by our holding in *Ernst*." 704 F.3d at 267. The "presence of an investigative component. . . does not bar the application of absolute immunity when the function of [defendant's] actions is still fundamentally prosecutorial in nature," including acts done in preparation for initiating judicial proceedings. *Id.* at 269. As the Court of Appeals stated, "the key to the absolute immunity determination is not the timing of the investigation relative to a judicial proceeding, but rather the underlying function that the investigation serves and the role the caseworker occupies in carrying it out." *Id.* at 270.

Thus, in order to determine if Ms. Manuel and/or Ms. Horton are entitled to absolute immunity, it is necessary to separately evaluate their actions to determine if they were prosecutorial or investigative in nature.

a. Defendant Manuel

In part, Plaintiffs base their substantive due process claim against Ms. Manuel on the fact that she obtained the ECA based on false information, i.e., that Judge McCrady had ordered OCYF to remove the children if the Guests were not compliant in any way with the court's directives.

17

As the undisputed evidence of record establishes, Ms. Manuel initially participated in a staffing during which a decision was made to file a dependency petition. She had no involvement in preparing this petition and did not appear before Judge McCrady. She later obtained information from Ms. Horton regarding Mr. Guest's refusal of the drug screen and Ms. Horton's understanding of the substance of Judge McCrady's order, which had not yet been committed to writing. Ms. Manuel then spoke to an Allegheny County assistant solicitor and her supervisors, and they made the decision to seek an ECA after hours. As a result, she sought an ECA and Judge Woodruff issued the ECA.

All of these actions were prosecutorial in nature and in the course of dependency proceedings. Ms. Manuel participated in the decision to commence a dependency proceeding, obtained information from Ms. Horton regarding Judge McCrady's verbal order and conferred with her supervisors and an assistant county solicitor about whether to seek an ECA. She then sought and obtained an ECA after presenting the information to a judge. Thus, at all times she was engaged in preparing for and prosecuting dependency proceedings. The fact that she received and relied on information from Ms. Horton that she later learned was not accurate does not change the nature of her involvement. Thus, she has absolute immunity for these actions.

Plaintiffs further assert that Ms. Manuel violated their substantive due process rights by failing to conduct additional investigation when Ms. Horton went to the Guest home to remove the children. Specifically, Plaintiffs contend that despite the language of the ECA that authorizes the County to further investigate if the children were in imminent danger, Ms. Manuel failed to investigate or direct Ms. Horton to do so. The ECA Acknowledgement form, which is prepared by Allegheny County, states that the County is authorized by the ECA to further investigate the circumstances and if, in fact, the children are in imminent danger, they can be removed. At the

same time, she understood Allegheny County's policy to be that children are to be removed if an ECA is issued. Notably, the ECA form authorizes, but does not require, a further investigation in order to determine if the children are in imminent danger.

During the execution of the ECA, Ms. Horton shared with Ms. Manuel the information conveyed by Mr. Guest regarding the reason for his failure to complete the drug screening ordered by Judge McCrady. Ms. Manuel and Ms. Horton did not discuss whether the children were in imminent danger. Ms. Manuel instructed Ms. Horton to remove the children because the ECA had been issued. Ms. Manuel understood the County's policy was to take children into custody when an ECA is issued. Thus, Ms. Manuel was following the County's directive in her instructions to Ms. Horton.

At the same time, there was an element of investigation involved during these events because the information conveyed by Mr. Guest called into question the reason that the ECA was sought, that is, his noncompliance with Judge McCrady's order. This information was relayed to Ms. Manuel and she directed Ms. Horton to proceed with removing the children. As noted in *B.S.,* the presence of an investigative component does not exclude the application of absolute immunity when the function of the relevant actions fundamentally remains prosecutorial in nature. At the same time, the information conveyed by Mr. Guest to Ms. Horton could be interpreted as part of an investigation that was not prosecutorial, and the information obtained appeared to be contrary to the basis for the ECA which had been told to Ms. Manuel and considered by her in the decision to proceed with the ECA. Thus, while it is a close call, when viewing all of the facts in the light most favorable to Plaintiffs, the Court concludes that Ms. Manuel is not entitled to absolute immunity for her actions during the execution of the ECA.

b.   Defendant Horton

Plaintiffs assert that Ms. Horton violated their substantive due process rights by her role in the removal of the children from Guest home without a reasonable suspicion of abuse or neglect. Turning first to the events that preceded their removal, Plaintiffs contend that Ms. Horton cannot invoke absolute immunity because she made false statements in the dependency petition. *See Hardwick v. County of Orange*, 844 F.3d 1112, 1116 (9th Cir. 2017) (denying absolute immunity to social workers who allegedly fabricated evidence during an investigation and made false statements in a dependency petition affidavit).

Notably, the dependency petition includes a significant amount of other information about issues in the Guest home and there is no evidence that Ms. Horton deliberately falsified this information. Moreover, Plaintiffs do not contend that the children were removed from the home based on these representations. Thus, because her actions in connection with preparing the dependency petition were prosecutorial in nature, Ms. Horton is entitled to absolute immunity for her actions prior to and during the May 15, 2019 proceeding before Judge McCrady. Simply put, her actions were for the formulation and presentation to the court in the course of the dependency proceeding and she is absolutely immune for these actions.

The ECA was issued based on Ms. Horton's understanding of Judge McCrady's verbal order, which directed OCYF to remove the children if there was "no compliancy" before the next scheduled hearing. She interpreted Mr. Guest's failure to complete his drug test as a lack of compliance and as such, a violation of Judge McCrady's order. Although this interpretation was not correct, there is no evidence that she did, in fact, understand the substance of the order and deliberately ignored it, or that she knowingly conveyed false information to Ms. Manuel. Moreover, Ms. Horton's only knowledge about Mr. Guest's drug test on the day that the decision

20

was made to remove the children were removed is that he failed to take it. Once she received this information, she conveyed it to Ms. Manuel and Ms. Manuel, after consulting others, sought and received the ECA.

Under these facts, Ms. Horton's actions prior to the execution of the ECA were prosecutorial in nature because they were taken in the context of a pending dependency proceeding. Moreover, there is no evidence that she deliberately misconstrued Judge McCrady's directive, and it is undisputed that she was advised that Mr. Guest refused the drug screening. Thus, she is entitled to absolute immunity for this conduct.

At the same time, for the same reasons discussed in connection with Ms. Manuel, the Court cannot conclude that Ms. Horton is entitled to absolute immunity in connection with the removal of the Guest children because of the potentially investigative, as opposed to prosecutorial, component of her actions at that time.

Thus, the Court now turns to the question of whether Ms. Manuel and Ms. Horton are entitled to qualified immunity for the removal of the children from the Guest home on May 15, 2019 and subsequent events.

### 2.  Qualified Immunity

 "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is an objective decision to be decided by the court as a matter of law. *Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir. 2004). The burden of pleading a qualified immunity defense rests with the defendant, not the plaintiff. *Thomas v. Independence Township*,

463 F.3d 285, 293 (3d Cir. 2006).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The ultimate question is whether the state of the law when the offense occurred gave a defendant "fair warning" that her acts were unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

The court should look first to applicable Supreme Court precedent. "Even if none exists, it may be possible that a 'robust consensus of cases of persuasive authority' in the Court[s] of Appeals could clearly establish a right for purposes of qualified immunity." *Mammaro v. New Jersey Div. of Child Protection & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016) (quoting *Taylor v. Barkes*, 575 U.S. 822, 826 (2015)).

Defining the right at issue is critical to this inquiry. The court must frame the right "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). But this does not mean that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful. The Supreme Court has explained that, "[a]lthough earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope*, 536 U.S. at 741. Indeed, the Court has made clear that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.*

As Defendants contend, there is no clear authority based on substantially similar facts and circumstances that would have placed Ms. Horton or Ms. Manuel on notice that they were violating the Guests' due process rights. *See Gajarov v. Allegheny Cty. Off. of Child., Youth, & Fams.*, 2021 WL 140842, at *10 (W.D. Pa. Jan. 15, 2021) (granting qualified immunity to a caseworker who removed a child based solely on one doctor's report and a conversation with the parents who advanced an alternate benign explanation for the injury, and despite an evident language barrier, because it was not clearly established that such action was unconstitutional).

Ms. Horton and Ms. Manuel carried out the ECA because they believed that they were following a directive from the court in the form of a verbal court order. Moreover, they believed that they were following established Allegheny County policy. It is uncontroverted that once an ECA is issued, it is the practice of Allegheny County to take children into shelter care pending a hearing except in a very rare situation. Both Ms. Horton and Ms. Manuel testified as to their understanding that if an ECA is issued, they must execute it. Ms. Horton received no training that any additional investigation was required after an ECA is issued to ensure that the child or children are only taken into custody if there is imminent danger because of the surroundings. In ordering Ms. Horton to execute the ECA despite Mr. Guest's claim that he did not refuse the drug test, Ms. Manuel was acting according to an OCYF practice that she used at least 200 times and she had no reason to believe that it was incorrect, let alone unconstitutional. Thus, while Mr. Guest conveyed information that was contrary to their understanding of his "refusal" of the drug screen, both Ms. Horton and Ms. Manuel executed the ECA because of the existence of a court order and the well-established policies of Allegheny County.

In short, there is no factual basis in the record to support a conclusion that the conduct of either of these defendants violated clearly established constitutional rights of which a reasonable

person would know. Thus, as it relates to the execution of the ECA, both Ms. Horton and Ms. Manuel are entitled to qualified immunity because it was not clearly established that their actions in connection with the removal of the children were unconstitutional.

With respect to Ms. Horton's preparation of the shelter application, she knew that Mr. Guest told her that he had tried and failed to produce a urine specimen on May 15 but tested negative the next day. By then, she was also aware of the substance of Judge McCrady's written Pre-Hearing Conference Order, which clearly stated that the circumstance under which OCYF was to obtain an ECA was if the agency received any new allegations of domestic violence or physical abuse, not if either of the parents refused to complete a drug screen. Despite this knowledge, her shelter petition erroneously stated that: "An ECA was obtained as it was court ordered if parents did not comply with obtaining a drug screen and other requests."  Based on this evidence, the Court cannot conclude that she is entitled to qualified immunity with respect to these actions. A reasonable person would have understood that false statements in a petition for the purpose of advocating for continued protective custody could violate the Guests' constitutional right to familial integrity.[7] *See Dennis v. DeJong*, 867 F. Supp. 2d 588, 632 (E.D. Pa. 2011) (false statements in ex parte memorandum stated a claim for violation of the parents' right to substantive due process and CYS administrator was not entitled to qualified immunity); *Thompson v. Wagner*, 631 F. Supp. 2d 664, 683 (W.D. Pa. 2008) ("false statements … do not constitute the type of good faith conduct that the defense of qualified immunity is meant to protect.")

Regarding Defendants' conduct at the subsequent shelter hearing on May 17, 2019,

---

[7] As discussed later in this opinion, Ms. Horton's actual testimony at the hearing acknowledged the reasons for Mr. Guest's "refusal." Moreover, her false statements did not result in the continued protective custody of the Guest children. Thus, her conduct did not result in a violation of Plaintiffs' constitutional rights.

Plaintiffs speculate that the actions of Ms. Horton and Ms. Manuel violated their substantive due process rights because OCYF sought to keep the children in protective custody solely in order to "teach the parents a lesson." However, Ms. Manuel testified that OCYF sought to keep the children from their parents and in foster care until May 31, 2019 because: "We asked them to comply with services. They would not comply with services. Their position was that their children were safe and that we needed to close our case; and we felt like we needed the Court behind us to encourage the Guests to at least try to alleviate the circumstances that were occurring." Notably, the Guardian Ad Litem for the children also recommended to the court that the children remain in foster care.

By advocating for continued protective custody of the Guest children under the facts of this case, including the substance of Ms. Horton's previous investigation, the Court concludes that the conduct of Ms. Horton or Ms. Manuel did not violate a clearly established constitutional right of which a reasonable person would have been aware. Thus, both defendants are entitled to qualified immunity with respect to their conduct at the shelter hearing.[8]

### C. Even if not immune from liability, Defendants Horton and Manuel are entitled to judgment in their favor

Even if it could be argued that Ms. Horton and Ms. Manuel are not entitled to immunity in connection with the claim asserted by the Guests, they are nonetheless entitled to judgment in their favor as a matter of law.

It is "the substantive component of the Clause that protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement

---

[8]At any rate, the hearing officer disagreed with the recommendation by OCYF of keeping the Guest children in protective custody and returned custody to their parents. Thus, it is undisputed that the conduct of Defendants at the shelter hearing did not result in a deprivation of Plaintiffs' constitutional rights.

them.'" *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). "To generate liability, executive action must be so ill-conceived or malicious that it 'shocks the conscience.'" *Miller v. City of Phila.*, 174 F.3d 368, 375 (3d Cir. 1999) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

The Supreme Court has recognized a "fundamental liberty interest of natural parents in the care, custody, and management of their child." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). That said, this Fourteenth Amendment liberty interest must be balanced against the government's compelling interest to protect children, and "does not include a right to remain free from child abuse investigations." *Croft v. Westmoreland County Child. & Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997). On the other hand, the government has "no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Id.* at 1125-26. Without reasonable suspicion, the coerced removal of children from their parents is an "arbitrary abuse[] of power" that violates substantive due process rights under the Fourteenth Amendment. *Id.* at 1126.

A claim related to a social worker removing a child from a parent's custody "requires decision-making by a social worker that is so clearly arbitrary … [that it] can properly be said to 'shock the conscience.'" *B.S.*, 704 F.3d at 268. A plaintiff must prove that the government's actions "reach a level of gross negligence or arbitrariness." *Mulholland v. Government County of Berks, Pa.,* 706 F.3d 227, 241 (3d Cir. 2013).

Defendants contend that removing the children from an environment with a history of domestic violence, coupled with information that Mr. Guest had refused to take a court-ordered drug test, cannot be described as "the most egregious official conduct" that "shocks the

conscience."[9] *Miller v. City of Phila.*, 174 F.3d 368, 375 (3d Cir. 1999). In *Miller*, the Department of Human Services ("DHS") received a report from a daycare center that two of the plaintiffs' children showed signs of abuse, which a doctor at least partially substantiated. The DHS caseworker sought an order from the on-call emergency judge to remove the children from the mother's custody. After a hearing 36 hours later, one child was returned, but a second child was kept over the weekend. The following Monday, the judge dissolved the restraining order and returned the child to his mother with certain conditions. DHS sporadically pursued a dependency action but ultimately dissolved the petition. The plaintiffs in *Miller* pointed to various missteps by the DHS caseworker but the court concluded that the caseworker did not act in a way that shocked the conscience because there was substantial evidence that he reasonably believed the children were in danger of abuse. *Id.* at 377.

The *Miller* court contrasted these facts with those in *Croft*, 103 F.3d at 1126-27, in which a caseworker followed up on "six-fold hearsay report by an anonymous informant" of child abuse and uncovered no evidence of child abuse, but still threatened to remove the child that night. No facts were presented to a court and no court order was issued. The court in *Croft* stated that, before separating parent and child, caseworkers need "some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Id.* at 1124. The court concluded that the caseworker lacked objectively reasonable evidence of abuse and that the separation of parent and child under the circumstances

---

[9] Defendants also attempt to argue that the children were "in danger," citing to records from Westmoreland County, YouTube videos in which Mr. and Mrs. Guest accuse each other of improper behavior and reports from the West View police. However, Judge McCrady did not remove the children from the home on May 15, 2019 based on this information, Defendants did not apply for an ECA or remove the children from the home based on the existence of imminent harm and the children were returned to their parents' physical and legal custody on May 17, 2019.

was an arbitrary use of government power. *Id.* at 1127.

Plaintiffs argue that, as in *Croft*, Ms. Horton and Ms. Manuel had no objectively reasonable grounds on the night the children were removed to believe that they had been abused or were in imminent danger of abuse. Standing alone, this statement is true, but it ignores the underlying and undisputed facts that led to the events of that evening.

As explained above, it is undisputed that Ms. Horton interpreted Judge McCrady's statements at the hearing on May 15, 2019 to mean that any "non-compliance" by Mr. or Mrs. Guest with any directive of the court would be sufficient for OCYF to obtain an ECA (and Judge McCrady's order was not reduced to writing at that time). Further, she learned later that day only that Mr. Guest "refused" to complete the drug screen, which she interpreted as "non-compliance" with a court directive, and conveyed this information and her understanding of Judge McCrady's verbal order to her supervisor, Ms. Manuel. It is further undisputed that Ms. Manuel consulted with her superiors and an assistant County solicitor, and they agreed that seeking an ECA would be appropriate and that Ms. Manuel proceeded to contact Judge Woodruff, who issued the ECA. That night, Ms. Horton went to the Guest house to remove the children and Mr. Guest provided Ms. Horton with the form from the tester, which explained that he had been unsuccessful in providing a urine sample. Ms. Horton called Ms. Manuel, who informed her that because the ECA had been issued and the conditions had not changed—that is, Mr. Guest was still considered to have "refused" his drug screen—she was required to execute the ECA and remove the children. Aa previously discussed, both Ms. Horton and Ms. Manuel believed that once an ECA was issued, they were required to take the children into temporary custody until a shelter hearing was held.

The next day, Judge McCrady issued an order that directed OCYF to obtain an ECA only if there were new allegations of abuse or domestic violence, not if Mr. or Mrs. Guest tested positive for drugs. Mr. Guest completed a drug screen on May 16 and the result was negative. Ms. Horton, although aware of this development and the contents of Judge McCrady's written order, filed a shelter hearing application on the basis of his "refusal" to complete the drug screen the day before. On May 17, 2019, a shelter hearing was held. The hearing officer concluded that Mr. Guest "refused" to complete a drug screen on May 15 but expressed skepticism that this refusal was sufficient for OCYF to obtain the ECA pursuant to Judge McCrady's written order. As a result, custody of the children was returned to Mr. and Mrs. Guest less than 48 hours after the removal.

Plaintiffs were understandably disturbed by these events, but with respect to the application for the ECA and the removal of the children, Ms. Horton, Ms. Manuel and others made decisions that cannot be interpreted as conscience shocking. Plaintiffs dispute that Judge McCrady intended to authorize the removal of the children under these circumstances, but Defendants' understanding of Judge McCrady's statements at the hearing was plausible, even if it was not the correct interpretation of her directives.

Plaintiffs insist that when Ms. Horton arrived at their house with the ECA in hand, she could readily see that the children were not in "imminent danger." While this undoubtedly is true, it is also irrelevant. The ECA was not sought based on imminent danger to the children but because of Mr. Guest's alleged non-compliance with the directive of the court. Thus, the Guests' argument that the children were removed from their care despite the lack of any evidence that the children were in any imminent danger misses the mark. Defendants understood Judge McCrady's instructions to be that *any* "non-compliance" by the parents with the court's

directives, including a refusal to complete a drug screen, required OCYF to obtain an ECA.

Certainly, Defendants could have accepted Mr. Guest's explanation about the drug test and concluded that he did not "refuse" it. Indeed, Ms. Horton consulted with Ms. Manuel before the decision was made to proceed. They were unable that evening to further investigate what had happened during the drug test. Whether Mr. Guest was actually unable to submit a urine sample and why he made the decision to leave the facility at 3:30 p.m. was unknown. While they could have attempted under all of these circumstances to make a unilateral decision about what Judge McCrady meant by "non-compliance," their decision to proceed as directed by the ECA was not "conscience shocking."

Moreover, although Plaintiffs focus on the fact that they were only given an hour to make other arrangements for the children, Ms. Horton explained that the hour was late and the children still had to have a physical examination. Plaintiffs cite no authority that would suggest that failure to give parents more than an hour under these circumstances shocks the conscience Indeed, it is undisputed that efforts were made to make other arrangements for the children. Similarly, the fact that one of the children later developed an allergic reaction to formula while in foster care does not support a substantive due process claim against these defendants.

Finally, the fact that the hearing officer, who had access to Judge McCrady's written order, disagreed that Mr. Guest's "refusal" provided a basis for obtaining an ECA and returned custody of the children to the Guests, does not demonstrate that Defendants' conduct in removing the children was conscience shocking. Neither a transcript of the May 15 proceeding nor the judge's written order was available when the decision was made to seek an ECA. While the hearing officer found that insufficient evidence was presented to support keeping the children the custody of OCYF,  he also stated in his order that reasonable efforts had been made to

prevent their removal. As previously discussed, Defendants presented reasonable grounds for their recommendation of continued foster care, a conclusion also endorsed by the children's guardian ad litem.

Ms. Horton's actions on May 16, 2019 and thereafter are more problematic. Despite her knowledge by that point of the limits of Judge McCrady's written order and Mr. Guest's subsequent negative drug test, the shelter petition erroneously stated that: "An ECA was obtained as it was court ordered if parents did not comply with obtaining a drug screen and other requests." However, these misrepresentations did not result in a violation of Plaintiff's substantive due process rights, a fact that is fatal to Plaintiffs' claim. At the shelter hearing on May 17, 2019, Ms. Horton testified that she now understood that Mr. Guest would not have been able to produce a specimen in the remaining hour before the facility closed. While she advocated for the children's continued placement in foster care, the hearing officer disagreed and returned legal and physical custody to the Guests. Thus, Ms. Horton's statements in the shelter petition or at the hearing did not result in continued OCYF custody. As such, her actions during this time period did not violate Plaintiff's constitutional rights.

Finally, with respect to the infant who was being breast-fed and developed hives from formula while in foster care, Plaintiffs have not developed this claim. It appears that when OCYF removed the children, care was not taken to ensure that the infant had breast milk and she had an allergic reaction to formula. However, this Court is aware of no authority that would describe these events, without more, as a violation of Plaintiffs' substantive due process rights.

Under all of these facts, viewed in the light most favorable to the Plaintiffs, no reasonable person could construe Defendants' actions as conscience shocking. Therefore, Defendant Horton and Manuel are entitled to summary judgment in their favor with respect to Plaintiffs'

substantive due process claim.

### D.  Liability of Allegheny County

Defendants argue that to the extent Plaintiffs are basing their claim against Allegheny County on vicarious liability, their claim fails as a matter of law because the County cannot be vicariously liable for the unconstitutional acts of its employees. *Monell v. Department of Social Servs. of N.Y.*, 436 U.S. 658, 694 (1978); *Groman v. City of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995). The doctrine of respondeat superior, which makes an employer automatically responsible for the wrongdoing of its employees, does not apply under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

A city or county government such as Allegheny County is a "person" for purposes of § 1983. *Monell,* 436 U.S. at 690-91. To establish § 1983 liability against Allegheny County, Plaintiffs must prove that a municipal "policy or custom" is the "moving force" of the constitutional violation at issue. *Id.* at 694. Thus, to establish a claim for liability in this case against Allegheny County, Plaintiffs must demonstrate that a policy or custom of Allegheny County caused constitutional violations. *Id*.; *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003); *Carter v. John J. Kane Reg'l Centers McKeesport*, 2011 WL 2470585, *4 (W.D. Pa. June 20, 2011).

Plaintiffs do not contend that any unconstitutional policy or practice of Allegheny County was involved in the events that occurred *after* the children were removed from the home. Thus, Plaintiffs do not have any basis for imposing liability on Allegheny County for these events. Rather, Plaintiffs claim that Allegheny County maintained a policy that permitted OCYF personnel to execute ECA orders even if the circumstances that led to their issuance had changed and the children were not in imminent danger. Thus, they argue that this policy led to a violation

of their substantive due process rights when the children were removed despite changed circumstances. However, as explained above, the record is undisputed that all of the underlying circumstances *had not* changed. The ECA was sought on the basis of Mr. Guest's non-compliance with a court order, which, as previously discussed, was a misinterpretation, not a false representation, of Judge McCrady's verbal order. Mr. Guest was still identified as having "refused" to complete the drug screen, even if the form he showed to Ms. Horton provided more information about the situation.

Both Ms. Horton and Ms. Manuel understood the County's policy to be that once an ECA is issued to remove children from a home, they are required to execute the order. According to OCYF's Director for the North Regional Office, the standard policy related to the execution of an ECA was that except in a very rare situation, children are taken into shelter care pending a hearing before the court.

Thus, while the County authorized OCYF and its caseworkers to further investigate the circumstances related to the ECA, its policy further provided that other than in rare circumstances, the children were to be taken into shelter care. This policy both authorizes some investigation and mandates compliance with the court order absent rare circumstances. As the County argues, this policy balances the ability to perform further investigation with the fact that there is an existing court order requiring removal.

In reviewing the County's policy in the context of this case, the ECA was issued because of Mr. Guest's alleged refusal to submit to a drug screen. Ms. Horton talked with Mr. Guest about the circumstances related to the drug screen and then discussed it with Ms. Manuel. Thus, some investigation did take place, after which Ms. Manuel directed that the removal should go forward. Disregarding the ECA at that point would have required a conclusion that the

circumstances had changed based on the limited facts at OCYF's disposal on the evening of May 15, 2019, including whether Mr. Guest's actions nonetheless represented "non-compliance" with Judge McCrady's verbal order. As the County notes, this is within the province of the court, not OCYF, under these circumstances.

Thus, because the policy of Allegheny County as applied to Plaintiffs did not violate their civil rights, the County is entitled to judgment in its favor.

## IV.   <u>Conclusion</u>

For the reasons cited above, Defendants' motion for summary judgment will be granted and Plaintiffs' motion for summary judgment will be denied.

Appropriate orders follow.

BY THE COURT:

s/ Patricia L Dodge
PATRICIA L. DODGE
United States Magistrate Judge

Dated: January 21, 2022